# CHOATE

Robert A. Kole
t 617-248-2121
f 617-248-4000
rkole@choate.com

December 18, 2018

Honorable Paul G. Gardephe
United States District Court
Southern District of New York
40 Foley Square, Room 705
New York, New York 10007

      Re:    *Starr Surplus Lines Ins. Co. and Houston Cas. Co. v. CRF Frozen Foods, LLC*
             Case No. 1:17-cv-01030-PGG

Dear Judge Gardephe:

      We represent Plaintiff Starr Surplus Lines Insurance Company ("Starr") in the above-referenced action. Pursuant to Your Honor's Individual Rules of Practice, please accept the following as Starr's request for a pre-motion conference. It is Starr's understanding that Plaintiff Houston Casualty Company ("HCC") and Defendant CRF Frozen Foods, LLC ("CRF") will also request a pre-motion conference.

      Starr proposes to move for summary judgment on Phase 1 of this matter, pursuant to Federal Rule of Civil Procedure 56. As Your Honor is aware, on July 26, 2017, the Court bifurcated this matter into two phases, with Phase 1 addressing the threshold issue of whether the product contamination insurance ("CPI") policy that Starr sold to CRF for the policy period of May 1, 2015 through May 1, 2016 (the "2015 Policy") should be rescinded.[1]

      Substantive discovery for Phase 1 of this matter is now complete. The undisputed evidence shows that:

(1)    In 2016, CRF recalled all of its food products after it was notified by the U.S. Food and Drug Administration ("FDA") and U.S. Centers for Disease Control ("CDC") that consumers had been hospitalized after eating CRF products that were contaminated with *Listeria monocytogenes* ("LM");

(2)    LM is a pathogen that causes a potentially deadly condition known as listeriosis, which predominately affects pregnant women, newborns, the elderly, and adults with impaired immune systems. LM has been among the most common causes of incidents involving foodborne illness incidents and product recalls in the U.S.;

---

[1] Only if necessary, Phase 2 will address CRF's 2016 recall, other coverage defenses, and damages.

**CHOATE HALL & STEWART LLP**
Two International Place  |  Boston MA 02110  |  **T** 617-248-5000  |  **F** 617-248-4000  |  choate.com

8993919

December 18, 2018
Page 2

    (3)    In three consecutive applications for CPI that CRF submitted to Starr between 2013 and 2015 (the "Applications"), CRF misrepresented material facts pertaining to (among other issues) its history of LM contamination at its food processing facility;

    (4)    Starr relied upon the contents of CRF's various Application materials in making its decision to issue, to set the terms and conditions of, and to establish the premium to be paid for the 2015 Policy; and,

    (5)    If CRF's Applications had been truthful, Starr would not have issued the 2015 Policy, would have required different terms, would have charged a greater premium for the risk that it accepted, and/or would have required a larger self-insured retention ("SIR").

The Policies each expressly provide -- as does governing New York law -- that any misrepresentation by CRF of a material fact which formed the basis of the 2015 Policy renders it void. Against that backdrop, Starr believes that this matter is ripe for summary judgment in its favor on Phase 1 (rescission) -- thereby obviating the need for a Phase 2 in this matter.

By way of background, between 2013 and 2015, Starr sold CRF three consecutive annual CPI policies, including the 2015 Policy (the "Starr Policies").[2] In connection with each of the Starr Policies, CRF submitted the Applications, in which Starr requested -- and CRF purported to disclose -- information concerning CRF's quality assurance procedures, product testing, and risk management. In the various Applications, and related materials, CRF represented, among other things, that CRF: (1) employed both in-line and end-of-line microbiological product testing; (2) tested product for pathogenic contamination upon customer request; (3) utilized both in-house and third-party laboratories for product testing; (4) subjected products to two "kill steps" -- both sterilization and blanching[3] -- to eradicate microbiological contamination, including LM; and (5) had never experienced a loss of any kind, including due to product contamination.

Additionally, the last question in each Application, Question 31, asked whether CRF had "knowledge or information of any specific facts, which may give rise to an incident and/or claim," and whether CRF knew "of any incident that would result in a claim if insurance had been in place." In all three Applications, CRF answered these questions, unequivocally: "No."

On each Application, immediately following Question 31, CRF signed a Declaration that stated, in pertinent part: "The applicant represents that the above statements and facts are true and that no material facts have been suppressed or misstated." In addition, each of the Starr Policies, including the 2015 Policy, contained a reliance endorsement, which stated, in pertinent part, that Starr had issued the Policy in reliance upon all of CRF's prior statements and representations contained in all of CRF's Applications as being accurate and complete.

Starr relied upon the contents of CRF's Application materials in deciding to accept the risk presented by CRF and to issue the 2015 Policy for, among other things, the amount of the

---

[2]     Although Starr seeks rescission of only the 2015 Policy, Starr relied upon CRF's disclosures in its Application materials for all three Policies that Starr sold to CRF.

[3]     Sterilization is a process used to eliminate all living micro-organisms (including LM). Blanching is a process wherein a food is scalded in boiling water, and removed after a brief, timed interval. In its Application materials, CRF disclosed that it blanched all products to at least 185 degrees Fahrenheit. LM cannot survive temperatures greater than 165 degrees Fahrenheit.

December 18, 2018
Page 3

SIR to be maintained by CRF, the amount and scope of coverage afforded (including any possible exclusions), and the premium to be charged. CRF never disclosed, and none of the disclosures in the Applications indicated, that CRF had a history of LM contamination.

The reality at CRF was far different from the disclosures that it made in its various Applications. Notwithstanding CRF's "No" response to Question 31, CRF was well aware of specific facts that "may give rise" -- and, later, did give rise -- to an incident and claim. The evidence shows, and the FDA found, among other things, that:

- In 2013, dozens of lots of CRF's finished product were found to be contaminated with LM;

- In 2014 and 2015, CRF found that dozens of samples of its finished product tested "pathogen positive";

- From 2013 to 2015, CRF found LM in dozens of environmental tests taken within its food processing plant; and

- CRF's third-party laboratory described instances of finished product contamination at CRF in November 2014 as a "major event";

- CRF's third-party laboratory expressed concerns to CRF regarding its pathogen test "failures," and what it described as a "harborage" in CRF's facility;

- In 2013, CRF's Operations Manager explained that CRF had an "extraordinary amount of exposure" to Listeria contamination, and, in 2015, CRF's General Operations Manager described CRF as being in a "compromised state for exposure to Listeria control."

CRF knew that its products repeatedly had tested pathogen-positive, and it distributed pathogen-positive products into interstate commerce. CRF never informed its customers that it had shipped them pathogen-positive food products.

The evidence also shows that CRF knew that LM contamination could lead to an "incident and/or claim." Among additional documentary and testimonial examples, Emily Camp, CRF's Director of Quality Systems, (who was responsible for CRF's testing program and signed the 2014 and 2015 Applications that CRF submitted to Starr), wrote to colleagues:

> I will see this year's corn has not passed on IEH test. I understand they will pasteurize it but it still is full of Lm and I am not going to take the risk that something goes wrong in there [sic] process and it kills a baby. I do not like kids but I also do not want to kill them.

Ms. Camp's fear that the conditions at CRF could lead to an incident were, sadly, prophetic. It is undisputed that in May 2016, CRF was constrained to recall all of its products after the FDA and CDC notified CRF that individuals had been hospitalized after eating LM-contaminated products, which had been traced back to CRF.

Had CRF disclosed any or all of the aforementioned facts to Starr, Starr would not have issued the 2015 Policy, would have required different terms, would have charged a greater

premium for the risk that it accepted, and/or would have required a larger SIR. Accordingly, Starr believes that it is entitled to summary judgment on Phase 1, and to rescission of the 2015 Policy.

Applicable New York law is straightforward: to prevail on its motion, Starr must establish that: (1) CRF made one or more misrepresentations in the CPI Applications that it submitted to Starr; and (2) the misrepresentations were material to Starr's underwriting of the 2015 Policy. N.Y. Ins. Law § 3105. Pursuant to the facts detailed above, CRF's statements that it knew of no facts that "may give rise" to "an incident and/or claim" were material misrepresentations.

First, a "misrepresentation" is a false "statement as to past or present fact, made to the insurer by, or by the authority of, the applicant for insurance . . . at or before the making of the insurance contract as an inducement to the making thereof." N.Y. Ins. Law. § 3105(a). Chief Magistrate Judge Freeman recently addressed the standard to be applied in determining whether an answer in response to a question such as Question 31 is a misrepresentation: "Knowledge of whether a particular act may give rise to a claim covered by an insurance policy is determined first by assessing whether the insured had subjective knowledge of the relevant facts, and then by asking whether a reasonable person in the insured's position would foresee that those facts might be the basis of a claim." *Travelers Cas. & Sur. Co. of Am. v. Gold, Scollar, Moshan, PLLC*, No. 14-cv-10106, 2018 U.S. Dist. LEXIS 46568, at *20-21 (S.D.N.Y. Mar. 14, 2018) (Freeman, M.J.) (internal citations and quotations omitted).

Under this standard, CRF's "No" responses to Question 31 in the Applications were misrepresentations. As detailed above, as of March 9, 2015, when CRF submitted its Application for the 2015 Policy, CRF had "subjective knowledge of the relevant facts" that may -- and, in fact, did -- lead to an "incident and/or claim." *See Travelers*, 2018 U.S. Dist. LEXIS 46568, at *20-21. Objectively, even if somehow CRF genuinely did not believe that persistent LM contamination might lead to an incident or claim, "a reasonable person" in CRF's position "would foresee that those facts" may be the basis of an incident or claim. *See id.* at *20-21. A history of LM *contamination* -- and the sale of products that had tested *pathogen-positive* to consumers -- are factors that, plainly, "may" (and did) lead to an incident or claim under a *contaminated products* insurance policy. *See id*.

Second, a misrepresentation is material if "knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make [the insurance] contract." N.Y. Ins. Law § 3105(b). Thus, a misrepresentation is "material" if knowledge by the insurance company of the misrepresented fact "would have resulted in a refusal to issue the same exact policy." *Nationwide Mut. Fire Ins. Co. v. Pascarella*, 993 F. Supp. 134, 136 (N.D.N.Y. 1998). Materiality is a question of law when the evidence concerning it is "clear and substantially uncontradicted." *E.g.*, *Travelers*, 2018 U.S. Dist. LEXIS 46568, at *24 (internal quotations omitted). A court may determine materiality as a matter of law based on documentary evidence of an insurer's underwriting practices, in tandem with testimony demonstrating that the insurer would not have issued the particular policy if the correct facts had been disclosed. *See, e.g.*, *Smith v. Guardian Life Ins. Co.*, 984 N.Y.S.2d 597, 598 (App. Div. 2014). In some cases, materiality is so self-evident that it may be proven as a matter of law through an underwriter's testimony alone. *E.g.*, *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380, 392 (S.D.N.Y. 2014), *aff'd sub nom. Cont'l Cas. Co. v. Boughton*, 695 F. App'x 596 (2d Cir. 2017).

As a matter of law, CRF's misrepresentations were material. It is unrefuted that Starr's underwriter would not have issued the 2015 Policy had she known the truth about CRF's LM contamination history. Her testimony is amply supported by the documentary record. Furthermore, evidence regarding Starr's underwriting practices with respect to other applicants demonstrates that it would not have written the same 2015 Policy (if at all) had it known the truth about CRF's history of LM contamination. *See, e.g., Phila. Indem. Ins. Co. v. Mendon Ponds Tennis Club, Inc.*, 687 N.Y.S.2d 511, 511-12 (App. Div. 1999) (materiality proven as a matter of law where insurer offered "proof of its underwriting practices with respect to applicants with similar histories").

Magistrate Judge Freeman recently granted summary judgment in an analogous matter where an insurer sought rescission of a professional liability policy based on a response to an application question that was similar to Question 31. *Travelers*, 2018 U.S. Dist. LEXIS 46568, at *8. In that case, a partner in the law firm at issue had misappropriated client funds from a trust account prior to the firm's submission of the application for insurance. *Id.* at *6. The Court concluded that the firm's "No" response to the analogous application question was a misrepresentation, because the partner was aware of her own conduct, and a "reasonable attorney" in her position would understand that misappropriating client funds may be the basis of a malpractice claim. *Id.* at *21. Moreover, the Court decided that the misrepresentation was material as a matter of law -- based solely on an underwriter's affidavit -- because the misrepresentation was "self-evidently material." *Id.* at *26. Likewise, the undisputed facts in this case are apt for summary judgment in Starr's favor.

For the reasons set forth above, Starr believes that it is entitled to summary judgment on its Phase 1 rescission claim, and respectfully requests this Court's leave for a pre-motion conference. If the Court is inclined to forego the pre-motion conference and grant Starr leave to file its motion for summary judgment, Starr will promptly propose a briefing schedule, after consultation with the other parties.

Thank you for your consideration of this matter.

Sincerely,

STARR SURPLUS LINES INSURANCE COMPANY,

By its attorneys,

/s/ Robert A. Kole
Robert A. Kole (admitted *pro hac vice*)
Matthew B. Arnould (admitted *pro hac vice*)
CHOATE, HALL & STEWART LLP
Two International Place
Boston, Massachusetts 02110
(617) 248-5000
rkole@choate.com
marnould@choate.com
*Counsel for Starr Surplus Lines Insurance Company*

8993919