# ANDERSON KILL P.C.

Attorneys and Counselors at Law

ONE GATEWAY CENTER, SUITE 1510 ■ NEWARK, NJ 07102
TELEPHONE: 973-642-5858 ■ FAX: 973-621-6361
www.andersonkill.com

Steven J. Pudell, Esq.
SPudell@andersonkill.com
973-642-5877

*Via ECF and Fax*                                                                                   December 21, 2018

Honorable Paul G. Gardephe, U.S.D.J.
United States District Court
Southern District of New York
40 Foley Square, Room 705
New York, NY 10007

      Re:   ***Starr Surplus Lines Insurance Company and Houston Casualty Company v. CRF Frozen Foods, LLC***
            **Civil Action No. 17-cv-1030 (PGG)**

Dear Judge Gardephe,

    This firm is co-counsel representing CRF Frozen Foods, LLC ("CRF") in the above-referenced matter.

    CRF has reviewed Starr Surplus Lines Insurance Company ("Starr") and Houston Casualty Company's ("HCC") (collectively the "Insurance Companies") respective December 18, 2018 letters requesting permission to file summary judgment motions as to Phase I in the above-referenced matter. It is CRF's understanding that the parties are in agreement that summary judgment motions should be briefed, heard, and considered by the Court. As a result, CRF does not oppose Starr and HCC's request for a pre-motion conference. However, if the Court is inclined to allow the cross-summary judgment motions to proceed without the need for a pre-motion conference, the parties have agreed to work together to submit a proposed briefing schedule, which would be provided in short order.

    While CRF believes the issues raised in the Insurance Companies' letters are best addressed through full briefing, the inaccuracies in the letters by Starr and HCC regarding the frozen food industry generally, and CRF and *Listeria monocytogenes* ("LM" or "Listeria") specifically require immediate response.

    Importantly, the record will demonstrate clearly and unambiguously that the presence of LM in a food processing plant, while concerning to a company like CRF, is not a precursor or a "red flag" that a recall, or bodily injury, was imminent, or even likely. CRF's loss history up until April 2016 is proof that the presence of LM does *not* mean, in any way, that a recall or bodily injury was likely to occur. Specifically, despite the existence of LM in CRF's plant in 2013, 2014, and 2015 (as is normal and to be expected in all food processing plants like CRF), it was not until 2016 that CRF experienced a recall. Before then, CRF had no claims for bodily injury caused by LM or

**Anderson Kill P.C.**

Hon. Paul G. Gardephe, U.S.D.J.
December 21, 2018
Page 2

any recalls. CRF, like all prudent and diligent food processing plants, addressed the presence of LM in its Pasco, Washington plant. Thus, the Insurers' talismanic use of words and phrases such as "contamination", "pathogen positive", and "listeria" do not, and cannot, advance their argument that CRF made a material misrepresentation.

In sum, the existence of LM does not mean CRF answered Question 31 incorrectly and certainly does not mean that CRF had any reason to believe there would be a recall or claim if insurance had been in place. The Insurance Companies' attempt to conflate the two should be disregarded. To that end, the record developed will demonstrate the following specific points:

First, *Listeria monocytogenes* is a very common organism found in almost any environment, whether in conjunction with animals, humans, vegetation, food processing plants, or even in a refrigerator in someone's home. It is well-known in the frozen vegetable industry that whenever a company, like CRF, brings raw material into its facility, it brings in LM. Given the inherit nature of LM in vegetation, it is entirely normal for LM to be present in frozen vegetable processing facilities. Thus, the presence of LM in CRF's plant was not a "contaminant", as the Insurance Companies would like to lead this Court to believe.

Second, it is true that LM can be a potentially dangerous pathogen that can cause a severe disease called Listeriosis when consumed. It is for that reason CRF was diligent and vigilant in "seeking out and destroying" LM.[1] CRF took active measures to eliminate LM and immediately reacted to positive test results in its facility.

Third, the existence of LM or "pathogen positive" material does not mean a recall or bodily injury to a consumer was likely. LM is something that CRF, and all frozen vegetable processors alike, dealt with continually. The existence of LM in a frozen food processing plant that produced *non* ready-to-eat ("NRTE" or "non-RTE") products was *not* a risk to public health and safety. In fact, while currently the FDA has specific regulations regarding the presence of LM in ready-to-eat ("RTE") food products, *the FDA has no specific regulatory requirements regarding the presence of LM in non-RTE foods* because LM is easily killed by heat treatments used to cook foods. *The FDA does not require frozen vegetable processing plants, like CRF's, to test their product for LM.* Even so, the CRF packages had cooking instructions on the label – which, when followed, would kill LM.

Fourth, CRF had a protocol in place from 2013 to 2016. This protocol was in place when CRF's predecessor, Bybee Foods, owned and ran the plant before 2013. CRF operated pursuant to this protocol. When CRF received a LM positive finished product test result, CRF reviewed the retest result. If the retest was negative for LM, CRF sold that product to a customer who did not require pathogen testing, presumably because that customer, such as a baby food company, would apply its own

---

[1] "Seek and destroy" is a common term used in the food processing industry with respect to LM.

**Anderson Kill P.C.**

Hon. Paul G. Gardephe, U.S.D.J.
December 21, 2018
Page 3

pasteurization or kill step in its processing of CRF's product. If the retest was also positive, CRF put the product on hold to be destroyed. Until the 2016 Recall, it was CRF's understanding that its retesting process was appropriate within the non-RTE industry. CRF used this protocol with great success until April 2016. Until then, CRF had never experienced any recall or any reports of bodily injury.

Finally, the IEH[2] test results referenced by the Insurance Companies do not specifically identify that the product contained a specific pathogen, such as LM. CRF sent product with IEH scores of 9 or less to those companies that needed pathogen free product. CRF sent product with IEH scores over 9 to those customers with a kill step.[3] CRF reasonably understood that its response to the IEH test results was proper and the common approach in the industry. Moreover, IEH has explained that a product with even a high IEH test result would not have to be destroyed, but instead could be reconditioned, or the product could be sent to a customer with a validated kill step.

Finally, the record will unambiguously demonstrate that the fight to control and eliminate LM is well known in the frozen vegetable industry and was well known to Starr and HCC. While Starr explicitly inquired in its applications if CRF was subject to any previous recalls (which it was not), neither Starr nor HCC ever asked to see any prior pathogen test results. CRF was confident that its time tested protocol was avoiding recalls and any claims that would be made under any insurance policy. CRF thought it was succeeding in its effort to eradicate LM from its products and until April 2016 was successful in doing so. CRF should not be punished for implementing a protocol it believed to be appropriate. Rather, CRF should be awarded the coverage it is rightly owed for the very event for which it bought insurance.

We thank Your Honor for your consideration in this matter.

Respectfully submitted,

/s/ Steven Pudell
Steven J. Pudell

cc:   *All Counsel of record via ECF*

---

[2]   IEH was the testing company that was used in place of, or in tandem with, Silliker.

[3]   CRF would not have sent product with scores over 50 into commerce. IEH testified that its high range was 30. In any event, no CRF product tested above 14.

100079480.6